[Cite as *State v. Williamson*, 2022-Ohio-185.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 29935 |
|---|---|
| Appellant | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ANTONIO WILLIAMSON | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellee | CASE No. CR 17 07 2512 |

DECISION AND JOURNAL ENTRY

Dated: January 26, 2022

TEODOSIO, Judge.

{¶1} Appellant, the State of Ohio, appeals from the decision of the Summit County Court of Common Pleas, granting Appellee, Antonio Williamson's, motion to dismiss ten counts of his indictment on the basis of selective prosecution. This Court reverses and remands for further proceedings.

I.

{¶2} Mr. Williamson used to be employed as a Summit County Deputy Sheriff. In the spring of 2017, he became the lead suspect in a sexual assault investigation. The Akron Police Department ("APD") handled the case and notified the Sheriff's Office that Mr. Williamson was under investigation. A detective from the Sheriff's Office was assigned to liaise with the APD as a point of contact, but the Sheriff's Office did not participate in the sexual assault investigation. Based on evidence the APD collected, Mr. Williamson was indicted on charges of rape, sexual

battery, gross sexual imposition, and kidnapping. He was placed on departmental leave several days after those charges were filed.

{¶3} The APD investigation continued after Mr. Williamson was indicted. As part of that investigation, the APD asked the Sheriff's Office, through its liaison, to request an audit of Mr. Williamson's searches in the Ohio Law Enforcement Gateway ("OHLEG"). The purpose of the audit was to determine whether Mr. Williamson had used OHLEG to search for the accuser in the sexual assault case. Because the Ohio Attorney General's Office ("the attorney general") maintains the OHLEG database, the Sheriff's Office liaison asked the attorney general to audit Mr. Williamson's searches for the purpose of determining whether he had searched for the accuser by any means.

{¶4} The attorney general notified the Sheriff's Office liaison that Mr. Williamson had not used OHLEG to search for the accuser. However, the attorney general also notified the liaison that Mr. Williamson had performed more than thirty self-searches, i.e., searches of his own name or license or registration. The attorney general informed the liaison that Mr. Williamson may have violated the Revised Code by doing so and that the matter would need to be investigated by either the attorney general or the Sheriff's Office. The Sheriff's Office chose to conduct the investigation itself and appointed the liaison as the detective in charge of that investigation. Because that investigation pertained to potential criminal violations of the Revised Code, the Sheriff's Office classified it as a criminal investigation. For the sake of clarity, hereinafter, this Court will refer to that investigation as the Sheriff's criminal investigation.

{¶5} The detective in charge of the Sheriff's criminal investigation received Mr. Williamson's OHLEG search history from the attorney general and reviewed it. He investigated the self-searches Mr. Williamson performed and was unable to link them to a law enforcement

purpose. After sharing the results of his investigation with the attorney general, the detective presented his findings to the Summit County Prosecutor's Office. That office reviewed the Sheriff's criminal investigation and concluded that probable cause to charge Mr. Williamson existed. Thereafter, a supplemental indictment issued, charging Mr. Williamson with ten counts of the unauthorized use of OHLEG in violation of R.C. 2913.04(D).

{¶6} Once Mr. Williamson was indicted on the OHLEG charges, the Sheriff's Office conducted an internal administrative investigation. The purpose of the administrative investigation was to determine whether Mr. Williamson, through his OHLEG searches, had violated any rules, regulations, policies, or procedures that would warrant disciplinary action for purposes of his employment. The Sheriff appointed a lieutenant from Internal Affairs to conduct that investigation. The administrative investigation led to disciplinary proceedings wherein it was determined that just cause for discipline existed and Mr. Williamson should be terminated. Following the disciplinary committee's recommendation, the Sheriff terminated Mr. Williamson.

{¶7} Mr. Williamson filed a motion to sever his two sets of criminal charges for trial. The trial court granted his motion, and it was decided that the sexual assault charges would be tried first. A lengthy period of discovery ensued during which Mr. Williamson requested OHLEG and Law Enforcement Automated Data System ("LEADS") usage records for other deputies in the Sheriff's Office. He reviewed those records and learned that several other deputies, all of whom were Caucasian, appeared to have improperly accessed those databases without being criminally prosecuted. Believing that he had been selected for prosecution because he was African American, Mr. Williamson moved to dismiss his OHLEG charges. The State responded in opposition to the motion to dismiss, and Mr. Williamson filed a reply. Upon

agreement of the parties, the trial court held the motion to dismiss in abeyance until the sexual assault charges could be resolved.

{¶8} The State ultimately dismissed two of Mr. Williamson's sexual assault charges, and a jury found him not guilty of his remaining sexual assault charges. Following the verdict in his favor, the trial court held an evidentiary hearing on his motion to dismiss and issued a written decision. The trial court determined that Mr. Williamson established his claim of selective prosecution. Consequently, it granted his motion to dismiss his OHLEG charges.

{¶9} The State now appeals from the trial court's decision to grant Mr. Williamson's motion to dismiss and raises one assignment of error for our review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED IN GRANTING DEFENDANT ANTONIO WILLIAMSON'S MOTION TO DISMISS COUNTS 6-15 OF THE INDICTMENT ON SELECTIVE PROSECUTION GROUNDS.

{¶10} In its sole assignment of error, the State argues that the trial court erred when it granted Mr. Williamson's motion to dismiss his OHLEG charges on the basis of selective prosecution. We agree.

{¶11} "[A] trial court's determination regarding a motion to dismiss on selective-prosecution grounds presents a mixed question of law and fact." *State v. Michel*, 9th Dist. Summit No. 24072, 2009-Ohio-450, ¶ 9. Thus, this Court's review of the trial court's determination "is analogous to our review of a motion to suppress." *Id.*

> When considering a motion to [dismiss on the grounds of selective prosecution], the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to

the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Internal citations omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. *Accord Michel* at ¶ 9, quoting *State v. Metcalf*, 9th Dist. Summit No. 23600, 2007-Ohio-4001, ¶ 6.

{¶12} "'A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution.'" *State v. Sanchez*, 9th Dist. Lorain No. 09CA009582, 2010-Ohio-4660, ¶ 33, quoting *State v. Getsy*, 84 Ohio St.3d 180, 203 (1998). Selective prosecution claims sound in equal protection and protect against prosecutions "based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *State v. LaMar*, 95 Ohio St.3d 181, 2002–Ohio–2128, ¶ 43, quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996), quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962).

> To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

(Internal quotations omitted.) *Getsy* at 203. "A mere showing that another person similarly situated was not prosecuted is not enough; a defendant must demonstrate actual discrimination due to invidious motives or bad faith. Intentional or purposeful discrimination will not be presumed from a showing of differing treatment." *State v. Freeman*, 20 Ohio St.3d 55, 58 (1985). *See also State v. Flynt*, 63 Ohio St.2d 132, 134 (1980) ("The conscious exercise of some selectivity in enforcement is not in itself * * * a violation of the United States Constitution.").

{¶13} We begin by outlining the findings of fact and conclusions of law made by the trial court. The trial court found that the APD asked the Sheriff's Office to audit Mr. Williamson's OHLEG searches as part of the sexual assault investigation the APD was conducting. The court found that Sheriff's Office Detective Jason Kline asked the attorney general to audit the searches Mr. Williamson had performed between January 2014 and March 2017. When that audit was complete, the attorney general reported that Mr. Williamson had not searched for the accuser but had conducted many self-searches that would need to be investigated by either the attorney general or the Sheriff's Office. The court found that, to remain in the good graces of the attorney general, the Sheriff's Office chose to undertake the investigation. The court further found that the attorney general directed the Sheriff's Office to present its findings to the Prosecutor's Office once it completed its investigation.

{¶14} The trial court found that Detective Kline was not able to speak to Mr. Williamson during the Sheriff's Office criminal investigation because Mr. Williamson's attorney told Detective Kline that Mr. Williamson would not be making any statements to law enforcement. The court found that the detective's inability to consult with Mr. Williamson meant he "was on his own to determine if there was a legitimate law enforcement purpose for [Mr. Williamson's] self-searches." The court noted that Detective Kline acknowledged the possibility that legitimate reasons for the searches may have existed; he was just unable to fathom what those reasons might have been. Following the detective's investigation, the court found, he shared his findings with the attorney general and then the Prosecutor's Office. Mr. Williamson was then indicted on the OHLEG charges.

{¶15} The trial court outlined the evidence Mr. Williamson presented to show that he was singled out for prosecution while other similarly situated individuals were not prosecuted.

That evidence consisted of investigations the Sheriff's Office conducted with respect to four individuals: (1) G.P., (2) A.B., (3) W.W., and (4) C.P. It is undisputed that all four individuals were Caucasian males who were employed as law enforcement officers with the Sheriff's Office.

{¶16} As to G.P., the trial court found that he used OHLEG to obtain information "about subjects of his prurient interests in January 2013." Although the Sheriff's Office determined that G.P. had violated several rules and regulations, the court found, the Sheriff's Office did not commence a criminal investigation or refer the matter to the Prosecutor's Office. Instead, only an administrative investigation was performed, and G.P. "resigned before the administrative investigation and process concluded." The court found that G.P.'s resignation would not have prevented the Sheriff's Office from referring the matter to the Prosecutor's Office, but "inexplicably, his use was never referred * * *."

{¶17} As to A.B., the trial court found that he asked a dispatcher to run a car's license plate while he was off duty. A.B. was driving home after his shift and called the dispatcher because he thought a car was following him. When the dispatcher questioned the propriety of the search, A.B. swore at the dispatcher and demanded the information. The dispatcher then made a complaint to his superior, and the Sheriff's Office launched an administrative investigation. The trial court found that the administrative investigation only resulted in A.B. being disciplined for his use of profanity. Because the Sheriff's Office determined that A.B. had requested a search for a law enforcement purpose, it concluded that he did not misuse the law enforcement database.[1] Thus, the court found, the Sheriff's Office did not report the matter to the Prosecutor's Office.

---

[1] A.B. was investigated for a potential misuse of LEADS rather than a potential misuse of OHLEG. While OHLEG violations are governed by R.C. 2913.04(D), LEADS violations are

{¶18}   As to W.W., the trial court found that he was off duty when he asked a dispatcher to run a check on an individual staying at his rental property.  The court found that the Sheriff's Office conducted an administrative investigation,[2] and the matter proceeded to disciplinary committee.  Although the committee recommended that W.W. be terminated, the trial court found, the Sheriff declined to follow their recommendation.  The Sheriff determined that W.W. had not acted in a criminal manner because he had requested a search for a law enforcement purpose.  The Sheriff determined that W.W. had only violated certain rules and regulations, so the Sheriff suspended him rather than terminating him.  The trial court found that the Sheriff's Office never launched a criminal investigation to determine whether W.W. had violated the Revised Code.  Likewise, the matter was never referred to the Prosecutor's Office.  Although the Sheriff's fiduciary attorney felt that W.W. had violated the law, the trial court found, he believed that referring the matter to the Prosecutor's Office would have been an act of insubordination on his part.

{¶19}   As to C.P., the trial court found that he performed a self-search in the summer of 2017 at the request of his supervisor.  The purpose of that search was to confirm for his annual review that he had a valid driver's license.  The trial court found that the attorney general was made aware of C.P.'s self-search, but C.P. was never disciplined or prosecuted.  While the attorney general acknowledged that self-searches in OHLEG are improper, it also determined that C.P. had performed his self-search for a law enforcement purpose.  The trial court found that C.P.'s self-search only led to the attorney general admonishing the Sheriff's Office not to have its employees conduct self-searches as part of their annual reviews.

governed by R.C. 2913.04(C).  Because the distinction has no bearing on our decision, we merely note that it exists.
[2] Much like A.B., W.W. was investigated for a potential misuse of LEADS.

{¶20} The trial court also found that C.P. used OHLEG to search certain deputies' names multiple times in 2015 and 2016. C.P. was unable to offer a specific reason for doing so but insisted that he must have done so for some law enforcement purpose. The trial court found his explanation on that point inconsistent with his earlier testimony wherein C.P. stated that there would be no legitimate reason for someone to run a deputy's name through OHLEG more than once per year as part of an annual review. The court noted that neither the Sheriff's Office, nor any other law enforcement agency investigated C.P.'s 2015 and 2016 searches.

{¶21} Apart from the evidence relating directly to G.P., A.B., W.W., and C.P., the trial court made two sets of findings that heavily influenced its decision. The first set of findings pertained to the OHLEG database and how the Sheriff's Office used that database around the time of Mr. Williamson's charged violations. The second set of findings pertained to the demographics of the Sheriff's Office.

{¶22} With respect to the OHLEG database, the trial court found that Mr. Williamson's violations occurred at a time when the practice of deputies conducting self-searches was "widespread." The court found that, in 2018, the attorney general became aware that the Sheriff's Office did not understand that having individuals conduct self-searches for their annual reviews was prohibited. As a result, the attorney general decertified every sworn deputy in the Sheriff's Office and required them to retrain and recertify to be able to use the OHLEG database. The court noted that all of Mr. Williamson's self-searches occurred before 2018. Nevertheless, the court noted, the Sheriff's Office "neither advised nor advocated to the [attorney general] or the [] Prosecutor's Office" that Mr. Williamson should not be prosecuted due to the widespread misunderstanding about the legality of self-searches.

{¶23} With respect to demographics, the trial court found that the Akron Chapter of the National Association for the Advancement of Colored People ("NAACP") approached the Sheriff in 2016 regarding the disproportionate number of African Americans in leadership roles in the Sheriff's Office as compared to the percentage of African Americans in the community. The court specifically noted that, at that time, the "fourth floor command group" was described as "lily white." The court found that the Sheriff selected Mr. Williamson for a promotion, in part, due to his race. The court found that "[Mr. Williamson], and likely other white [Sheriff's Office] deputies, were qualified for the position * * *, but [the Sheriff] promoted [Mr. Williamson], who he may not have otherwise promoted, to alleviate pressure from the NAACP."

{¶24} The trial court acknowledged that the investigations of G.P., A.B., W.W., and C.P. all began as internal administrative investigations rather than criminal investigations. Even so, the trial court found that those four individuals "would most likely have faced criminal investigation and/or prosecution" if the Sheriff's Office had reported them to the Prosecutor's Office. As further detailed below, the trial court found that the Sheriff chose not to protect Mr. Williamson from prosecution in the same manner that he had protected Caucasian deputies.

{¶25} The trial court found that "OHLEG misuses are first discovered and investigated internally [by the Sheriff's Office]; therefore, selection of [Sheriff's Office] employees for prosecution of OHLEG violations starts with the [Sheriff's Office.]" According to the trial court, the Sheriff demonstrated a "willingness to intervene and prevent prosecution when white [Sheriff's Office] deputies were alleged to have committed OHLEG violations, but not when an African American was similarly alleged to have violated OHLEG terms of use." The court cited W.W. as one example, noting that the Sheriff had interceded on his behalf when the disciplinary committee and police legal advisor felt he had violated the law. The court cited C.P. as a second

example, noting that the Sheriff had simply accepted C.P.'s self-serving statement that he had conducted multiple searches of other deputies in 2015 and 2016 for a law enforcement purpose. The trial court found that the Sheriff "never permitted GP, CP, WW, and AB's questionable uses of [law enforcement databases] to be referred to the Summit County Prosecutor for an independent determination of prosecution, only [Mr. Williamson's]." It further found that Mr. Williamson's self-searches were not "excused as a 'training issue' the way the white [] deputies' self-searches were classified." According to the trial court, the Sheriff's Office "did not even entertain an exercise of discretion whether to prosecute [Mr. Williamson]; yet discretion was exercised favorably for white [] deputies."

{¶26} The trial court concluded that the difference in Mr. Williamson's treatment went unexplained and there was "no other plausible reason, except race, for [the Sheriff's] failure to exercise his discretion not to refer [Mr. Williamson] for prosecution." Based on the findings detailed herein, the trial court determined that the Sheriff's "deliberate choice not to exercise any discretion in [Mr. Williamson's] selection for prosecution for the same violations committed by white [Sheriff's Office] deputies, who were not referred for prosecution, [was] invidious conduct based on [Mr. Williamson's] race." Consequently, it granted Mr. Williamson's motion to dismiss his OHLEG charges.

{¶27} On appeal, the State argues that the trial court erred in four respects. To facilitate our review, we have reordered the State's arguments. First, the State argues that the trial court should have denied Mr. Williamson's motion to dismiss because he did not allege selective prosecution on the part of the Summit County Prosecutor's Office. Second, the State argues that the trial court erred when it found that Mr. Williamson was singled out for prosecution as compared to other similarly situated individuals, i.e., G.P., A.B., W.W., and C.P. Third, the

State argues that the trial court erred when it determined that the decision to prosecute Mr. Williamson was motivated by a discriminatory intent. Fourth, and relatedly, the State argues that the trial court erred when it ignored undisputed evidence that a Caucasian deputy, B.T., was prosecuted and convicted on OHLEG charges around the same time as Mr. Williamson.

**Mr. Williamson's Allegation of Selective Prosecution**

{¶28} The trial court found that Mr. Williamson never directly accused the Summit County Prosecutor's Office of engaging in selective prosecution. Instead, he alleged that the Sheriff's Office selectively referred him for prosecution due to his race. The trial court reviewed his argument by analyzing "whether [the Sheriff's Office had] selected individuals for criminal investigation and referral based on race, rather than the prosecutor."

{¶29} The State argues that the trial court should have overruled Mr. Williamson's motion to dismiss when it found that he had not accused the Prosecutor's Office of selective prosecution. According to the State, only prosecutors are vested with the authority to determine whether to prosecute an individual for a crime. Thus, the State argues, a defendant must prove discrimination on the part of the Prosecutor's Office to succeed on a claim of selective prosecution. Because Mr. Williamson never alleged that the Prosecutor's Office engaged in selective prosecution, the State asks this Court to reverse the trial court's judgment as a matter of law.

{¶30} There is no indication in the record that the State raised this argument in the lower court. At the start of the evidentiary hearing, the trial court specifically noted that Mr. Williamson had alleged selective prosecution by the Sheriff's Office, not the prosecutor. The State agreed and argued that the evidence would show "there was no selective prosecution at the Summit County Sheriff's Office." Likewise, at the conclusion of the hearing, the State argued

that there had been no malfeasance by either the Prosecutor's Office or the Sheriff's Department and "[a]t no time did either department engage in selective prosecution * * *." The State never asked the trial court to reject Mr. Williamson's claim on the grounds that he had not accused the Prosecutor's Office of selective prosecution.

{¶31} It is well-settled that this Court will not address arguments for the first time on appeal. *State v. Lee*, 9th Dist. Summit No. 29597, 2020-Ohio-4970, ¶ 15. This Court acts as a reviewing court and will not usurp the role of the trial court by deciding new issues at the appellate level. *Allen v. Bennett*, 9th Dist. Summit Nos. 23570, 23573, 23576, 2007-Ohio-5411, ¶ 21. Because the State failed to raise its argument in the lower court, this Court will not address it.

### The Trial Court's Determination that Mr. Williamson was Similarly Situated to G.P., A.B., W.W., and C.P. and Singled Out for Prosecution

{¶32} As previously noted, it was Mr. Williamson's burden to prove that he was "singled out for prosecution" by the Sheriff's Office as compared to other "similarly situated" individuals. (Internal quotations omitted.) *Getsy*, 84 Ohio St.3d at 203. In other words, he had to show that the Sheriff's Office treated him differently than other persons "'who [were] in all relevant aspects alike [him].'" *Harsco Corp. v. Tracy*, 86 Ohio St.3d 189, 192 (1999), quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). The trial court determined that Mr. Williamson was singled out for prosecution by the Sheriff's Office because he was treated differently than G.P., A.B., W.W., and C.P. The State argues that the trial court erred in its determination because those four individuals were not similarly situated to Mr. Williamson. According to the State, the trial court failed to appreciate the unique manner in which the prosecution of Mr. Williamson arose as well as other significant differences between him and the other four individuals.

{¶33} Our examination of the trial court's decision is two-fold. Before turning to the trial court's legal analysis, we first must determine whether its findings of fact are supported by competent, credible evidence. *See Michel*, 2009-Ohio-450, at ¶ 9; *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8. To do so, we must examine its findings in the context of the evidence presented at the hearing on Mr. Williamson's motion to dismiss.

{¶34} APD Lieutenant Gerald Forney testified that he oversaw the sexual assault investigation against Mr. Williamson. As part of that investigation, he asked the Sheriff's Office to check whether Mr. Williamson had searched for the accuser in LEADS or OHLEG. Sheriff's Office Detective Jason Kline received that request and contacted the attorney general. Detective Kline testified that he asked the attorney general to determine whether Mr. Williamson had searched for the accuser in the sexual assault case. Once that search was complete, the attorney general notified Detective Kline that it had discovered numerous self-searches on the part of Mr. Williamson. The attorney general also notified the detective that those searches would need to be investigated by either the attorney general or the Sheriff's Office. Detective Kline testified that he consulted with his supervisor and was advised that the Sheriff's Office would handle the investigation. He then asked the attorney general for a copy of the searches Mr. Williamson had performed between January 2014 and March 2017.

{¶35} The trial court found that when Detective Kline initially submitted a request to the attorney general on behalf of the APD, he "submitted the request * * * with a date range of January 2014 through March 2017." That factual finding is not based on competent, credible evidence. Detective Kline specifically testified that his initial request was limited in scope as its only purpose was to determine whether Mr. Williamson had searched for the accuser. He did not ask for additional information until the Sheriff's criminal investigation commenced at the

direction of the attorney general. To the extent the trial court found otherwise, we need not accept that unsupported finding. *See Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8.

{¶36} Several witnesses explained that there are two different types of internal investigations the Sheriff's Office may perform: an administrative investigation and a criminal investigation. Administrative investigations may result in employment-based consequences while criminal investigations may result in criminal charges being pursued. It is undisputed that Mr. Williamson was subject to both types of investigations and that his criminal investigation proceeded first. Detective Kline testified that, in general, a supervisor within the Sheriff's Office will decide whether a matter will proceed as an administrative investigation, a criminal investigation, or both. He also testified, however, that some matters automatically begin as criminal investigations. For example, he testified, a criminal investigation would take place automatically if a citizen filed a criminal complaint against a patrol officer for a crime he allegedly committed while on duty. Detective Kline confirmed that Mr. Williamson was subject to a criminal investigation when his potential OHLEG violations were discovered because his alleged criminal violations were first discovered by an outside agency (i.e., the attorney general) and that agency instructed the Sheriff's Office that a criminal investigation had to occur.

{¶37} Michael Cody, the Sheriff's fiduciary attorney, explained a key difference between criminal investigations and administrative investigations. He explained that if an administrative investigation proceeds to disciplinary committee and the committee recommends disciplinary action, then the results of that investigation will be presented to the Sheriff. The Sheriff will then review the committee's recommendation and decide whether to follow it or take a different course of action. Conversely, Mr. Cody testified, the results of criminal investigations are not presented to the Sheriff. Mr. Cody explained that the detectives who conduct criminal

investigations present their findings directly to the prosecuting attorney. His testimony mirrored that of Detective Kline. Detective Kline testified that, once the detective bureau is assigned to conduct a criminal investigation, the results of that investigation are presented to the prosecutor. He confirmed that a detective is not given permission or clearance to make that presentation; rather "[it] is just part of the investigation, whether it's a founded or unfounded case." Because Mr. Williamson was subject to a criminal investigation, Detective Kline testified, he had to report the results of his investigation to the Prosecutor's Office. He confirmed that he shared the results of his investigation with the attorney general first, and the attorney general advised him to present the results of his investigation to the Prosecutor's Office.

{¶38} At the outset of its decision, the trial court found that the attorney general discovered many self-searches on the part of Mr. Williamson and told the Sheriff's Office that either the attorney general or the Sheriff's Office would need to investigate those potential violations. The court also found that the attorney general reviewed the results of the Sheriff's criminal investigation with Detective Kline and directed him to present those results to the Prosecutor's Office. The foregoing findings are consistent with the testimony presented at the evidentiary hearing. Therefore, they are supported by competent, credible evidence, and we accept them as true for purposes of our decision. *See Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8.

{¶39} Later in its decision, the trial court found that "[Sheriff Office] employees' OHLEG misuses are first discovered and investigated internally; therefore, selection of [Sheriff's Office] employees for prosecution of OHLEG violations starts with the [Sheriff's Office]." The trial court also found that the Sheriff "fail[ed] to exercise his discretion not to refer [Mr. Williamson] for prosecution." A review of the record reveals that neither finding is based on

competent, credible evidence. Mr. Williamson was a Sheriff's Office employee, but his OHLEG misuses were not first discovered internally. His OHLEG violations were first discovered by the attorney general, as the trial court acknowledged earlier in its decision. Moreover, the decision whether to refer him to the Prosecutor's Office did not rest with the Sheriff. Because Mr. Williamson was subject to a criminal investigation, the results of that investigation were presented directly to the Prosecutor's Office, not the Sheriff. The evidence showed that the attorney general specifically advised Detective Kline to present the results of that investigation to the Prosecutor's Office. Indeed, the trial court made that finding earlier in its decision. To the extent the court found that the Sheriff's Office selected Mr. Williamson for prosecution or that the Sheriff was responsible for his referral to the Prosecutor's Office, those findings are not supported by the record. Therefore, we need not accept them as true for purposes of our decision. *See id.*

{¶40} The trial court acknowledged, and it is undisputed, that G.P., A.B., W.W., and C.P. were all subject to internal and/or administrative investigations, not criminal investigations. Mr. Williamson was the only one subject to a criminal investigation. The trial court nevertheless concluded that Mr. Williamson was similarly situated to G.P., A.B., W.W., and C.P. because they all committed OHLEG or LEADS violations and "would most likely have faced criminal investigations and/or prosecution" if the Sheriff had reported them to the Prosecutor's Office. It was the trial court's conclusion that the Sheriff protected G.P., A.B., W.W., and C.P. from prosecution because they were Caucasian. Thus, the trial court essentially found that G.P., A.B., W.W., and C.P. were similarly situated to Mr. Williamson but spared his fate due to the intervention of the Sheriff on their behalf.

{¶41} As previously noted, it was Mr. Williamson's burden to show that the Sheriff's Office treated him differently than other persons "'who [were] in all relevant aspects alike [him].'" *Harsco Corp.*, 86 Ohio St.3d at 192, quoting *Nordlinger*, 505 U.S. at 10. G.P., A.B., W.W., and C.P. were not alike Mr. Williamson in all relevant aspects because they were never subject to a criminal investigation at the direction of the attorney general. The trial court reasoned that the distinction was immaterial because, had G.P., A.B., W.W., and C.P. been referred to the Prosecutor's Office, they likely would have been criminally investigated and prosecuted. Yet, that rationale is wholly speculative. One also could speculate that, had Mr. Williamson's OHLEG violations been discovered internally, he likely would have been subject to only an administrative investigation. Speculation aside, the evidence shows that the procedural posture of Mr. Williamson's case was different than the procedural postures of the others' cases. The trial court's conclusion that he was similarly situated to G.P., A.B., W.W., and C.P. is tenuous at best. Moreover, even assuming Mr. Williamson was similarly situated to them, he also had to show that the reason he was treated differently from them was because he was African American. *See Getsy*, 84 Ohio St.3d at 203; *Freeman*, 20 Ohio St.3d at 58.

**The Trial Court's Determination that Mr. Williamson Demonstrated Actual Discrimination Due to Invidious Motives**

{¶42} With respect to G.P., it is not clear from the evidence presented at the hearing why he was not referred for criminal investigation. The record supports the trial court's findings that G.P. used OHLEG for a non-law enforcement purpose and ultimately resigned without the Sheriff's Office conducting a criminal investigation or referring his case to the Prosecutor's Office. Yet, his misconduct arose in 2013, and none of the witnesses who testified at the evidentiary hearing were involved in his investigation. Mr. Cody specifically testified that he

"[did not] know anything [about] [G.P.]" and "definitely [did not] know whether or not [his] facts were presented to the prosecutor's office before [his] resignation was accepted." Thus, there was no evidence about any specific decision not to refer G.P. for additional investigation. Without additional information, it is impossible to say whether G.P. and Mr. Williamson were treated differently based on race.

{¶43} With respect to A.B., the evidence presented at the hearing showed that the Sheriff's Office did not refer him for criminal investigation or prosecution because it determined that he requested a LEADS search for a law enforcement purpose. There was testimony that, upon administrative investigation, the disciplinary committee determined that his use of LEADS was appropriate, and the Sheriff agreed. His case was distinct from Mr. Williamson's case in two material respects. First, as previously explained, the fact that A.B.'s case proceeded as an administrative investigation meant there was an opportunity for the Sheriff to exercise his discretion. That opportunity did not exist in Mr. Williamson's case because he was subject to a criminal investigation. Second, unlike A.B., the purpose behind Mr. Williamson's self-searches was never revealed. The trial court specifically found that Detective Kline "was on his own" to determine if Mr. Williamson's searches were for a law enforcement purpose because Mr. Williamson never made any statements to law enforcement. While A.B. and Mr. Williamson were treated differently, the record reflects that there were several non-discriminatory reasons for that difference.

{¶44} With respect to W.W., the evidence presented at the hearing showed that the Sheriff's Office did not refer him for criminal investigation or prosecution because the Sheriff determined that W.W. had requested a LEADS search for a law enforcement purpose. The difference between W.W. and A.B. was that, in W.W.'s case, the disciplinary committee felt he

had misused LEADS, and the Sheriff disagreed. The trial court emphasized the Sheriff's decision to intercede on W.W.'s behalf even when the disciplinary committee felt he had violated the law. The court cited the Sheriff's failure to intercede on Mr. Williamson's behalf as evidence of his discriminatory intent. Yet, the same material differences that existed between A.B. and Mr. Williamson also existed between W.W. and Mr. Williamson. Because Mr. Williamson was subject to a criminal investigation, there was never an opportunity for the Sheriff to intercede on his behalf. His case was presented directly to the Prosecutor's Office, not the Sheriff. Further, because the purpose behind Mr. Williamson's self-searches was never explained, it would have been impossible for anyone to find that he had acted for a law enforcement purpose. While W.W. and Mr. Williamson were treated differently, the record reflects that there were several non-discriminatory reasons for that difference.

{¶45} With respect to C.P., we note that he conducted two different types of searches: a self-search in 2017 and multiple searches of certain deputies in 2015 and 2016. The trial court found that C.P. was unable to provide a specific law enforcement purpose for the deputy searches he performed in 2015 and 2016. It found that he made a "self-serving claim" that he must have had some law enforcement purpose for those searches and that his "elusive unidentifiable law enforcement purpose * * * was accepted without hesitation" by the Sheriff's Office. There is no evidence in the record, however, that the Sheriff's Office was aware of those searches before the evidentiary hearing. Mr. Williamson did not include the 2015 and 2016 searches in his motion to dismiss. Instead, he waited until the hearing and asked C.P. to recall, absent any context, why he had performed those searches four to five years earlier. Even if C.P.'s answer was "self-serving," the court's finding that the Sheriff's Office "accepted [it] without hesitation" is not based on competent, credible evidence. *See Burnside*, 100 Ohio St.3d

152, 2003-Ohio-5372, at ¶ 8. Mr. Williamson failed to set forth any evidence that those searches were ever brought to the attention of the Sheriff's Office. If the Sheriff's Office was unaware of those searches, there was never an opportunity for it to pursue or decline to pursue an investigation against C.P.

{¶46} As to C.P.'s self-search in 2017, the evidence showed that he performed that search at the direction of his supervisor. Mr. Cody, the Sheriff's fiduciary attorney, testified that the matter was investigated, that both an OHLEG administrator with the attorney general and a system administrator for Bureau of Criminal Investigation advised the Sheriff's Office that C.P.'s self-search had been for a law enforcement purpose, and that the investigation was closed based on that determination. Unlike Mr. Williamson, the purpose for C.P.'s self-search was clear, and the attorney general specifically determined that no OHLEG violation had occurred. The record supports the conclusion that there were non-discriminatory reasons for the difference in C.P.'s and Mr. Williamson's respective treatment.

{¶47} The trial court acknowledged that the attorney general found C.P.'s self-search to be for a law enforcement purpose. Nevertheless, the court relied on C.P.'s self-search as evidence that, before 2018, no one in the Sheriff's Office appreciated the fact that self-searches were prohibited. The court noted that the attorney general had to "admonish[] the [Sheriff's Office] not to use OHLEG in this manner again, and that the [Sheriff's Office's] practice of having persons conduct self-searches on OHLEG as part of an annual review must change." The trial court emphasized that the problem was so pervasive that it caused the attorney general to decertify every sworn deputy in the Sheriff's Office and require them to retrain and recertify to be able to use the OHLEG database. Even so, the court found, Mr. Williamson's self-searches

were not "excused as a 'training issue' the way the white [] deputies' self-searches were classified."

{¶48} The record reflects that Detective Kline and the attorney general uncovered 36 self-searches on the part of Mr. Williamson, ten of which were primary searches based on his name. He conducted far more than one self-search, and there was no evidence that he performed those searches as part of his annual review. Indeed, the reason for his self-searches was never discovered. It is unclear how anyone could have excused Mr. Williamson's self-searches as a "training issue" without knowing the reason for his searches. The record reflects that the Sheriff's Office, through Detective Kline, consulted the attorney general after investigating Mr. Williamson, and the attorney general instructed the Sheriff's Office to present the case to the Prosecutor's Office. Mr. Williamson's case was referred for prosecution because he was subject to a criminal investigation and there was no evidence that he conducted his self-searches for a law enforcement purpose. The record, therefore, does not support the trial court's conclusion that the difference in Mr. Williamson's treatment "was unexplained."

{¶49} In determining that Mr. Williamson was singled out for prosecution based on his race, the trial court also failed to address evidence that a Caucasian deputy, B.T., was prosecuted on OHLEG charges around the same time as Mr. Williamson. There was testimony that B.T. was dating a dispatcher and, when their relationship ended, he began stalking her. An administrative investigation ensued, during which investigators learned that B.T. had used OHLEG to conduct third-party searches, including searches of the dispatcher. Once the potential OHLEG violations were discovered, Detective Kline was assigned to conduct a criminal investigation of B.T. Detective Kline testified that he presented the results of his investigation to the Prosecutor's Office, and B.T. was indicted on multiple counts of the misuse of OHLEG. The

evidence showed that B.T. was indicted in May 2018, which was five months after Mr. Williamson was indicted and three months before Mr. Williamson moved to dismiss his OHLEG charges. The State specifically argued that B.T. was similarly situated to Mr. Williamson and that his criminal investigation, referral to the Prosecutor's Office, and indictment were evidence that Mr. Williamson was not singled out for prosecution. Nevertheless, the trial court's decision does not contain any reference to B.T.

{¶50} Upon review, the record does not support the trial court's conclusion that either the Sheriff or the Sheriff's Office purposely singled out Mr. Williamson for prosecution based on his race. *See Getsy*, 84 Ohio St.3d at 203; *Freeman*, 20 Ohio St.3d at 58. Mr. Williamson's self-searches were uncovered by the attorney general and investigated and referred to the Prosecutor's Office at the instruction of the attorney general. There was never an opportunity for the Sheriff to exercise any discretion in favor of Mr. Williamson and, in any event, there was no evidence that Mr. Williamson's self-searches were performed for a law enforcement purpose. While the Sheriff's Office never referred G.P., A.B., W.W., or C.P. for criminal investigation or prosecution, Mr. Williamson failed to show that the difference in their treatment was a function of race. *See* Discussion, *supra*. It was Mr. Williamson's "heavy burden" to establish a claim of selective prosecution, *Getsy* at 203, and the record does not support the conclusion that he met his burden. Accordingly, we must conclude that the trial court erred when it granted his motion to dismiss. The State's sole assignment of error is sustained.

III.

{¶51} The State's sole assignment of error is sustained. The judgment of the Summit County Court of Common Pleas is reversed, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment reversed,
and cause remanded.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

_____
THOMAS A. TEODOSIO
FOR THE COURT

CARR, P. J.
CALLAHAN, J.
CONCUR.


APPEARANCES:

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellant.

IAN N. FRIEDMAN, Attorney at Law, for Appellee.

MARK R. DEVAN, Attorney at Law, for Appellee.