[Cite as *State v. Baker*, 2023-Ohio-241.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                        Court of Appeals No.  L-21-1258

        Appellee                                     Trial Court No.  CR0202002036

v.

Angela Baker                                         **<u>DECISION AND JUDGMENT</u>**

        Appellant                                    Decided:  January 27, 2023

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Thomas P. Kurt, for appellant.

* * * * *

## I.  Introduction

**OSOWIK, J.**

{¶ 1} Following a jury trial, the defendant-appellant, Angela Baker, was convicted

on two counts of ethnic intimidation and two counts of aggravated menacing by the

Lucas County Court of Common Pleas.  Baker was accused of directing racial epithets

and threatening to "kill" two teenaged boys with her car during an altercation in a Meijer

parking lot. On appeal, Baker argues that the trial court erred in denying her motion to dismiss on selective prosecution grounds and further erred in failing to provide a self-defense instruction to the jury. As set forth below, we affirm.

## II. Background

{¶ 2} The incident in this case occurred in the parking lot of a Meijer Store in Oregon, Ohio, around 5 p.m. on July 7, 2020. Baker was living out of her car at the time and specifically in the Meijer lot. Baker's blue Dodge Charger was parked in an empty section, near a light post. While seated inside her car, two teenaged boys, and brothers, D.V., aged 15, and A.H. aged 17 ("the victims"), walked by Baker's car. The victims traversed the lot, from a nearby hotel to Meijer for some "snacks." Baker is Caucasian; the victims are African-American.

{¶ 3} The record in this case includes footage from D.V.'s cell phone that captured part of the altercation as well as three "body cam" videos, taken by the two arresting officers from the Oregon Police Department. The officers interviewed Baker, the victims, and an eyewitness. A description of the video evidence is set forth below.

{¶ 4} By all accounts, the incident began when Baker "flipped off" the victims, with her middle finger, as they walked by her car. In the first police video, when asked why she made that gesture, Baker said that she was "tired of these fucking [N-words] harassing me. Always walking past my car and all this bullshit and harassing me. So, I flip them off and then [A.H.] starts coming towards me * * * running his mouth."

2.

{¶ 5} Footage from D.V.'s cell phone captured what happened next. As the cell phone video begins, D.V. can be heard yelling, "this bitch is racist as fuck," and A.H. is seen walking toward the car. Baker is heard, muttering something that includes the word "die," and the victims demand to know "how we going to die" and "what we going to die for" and "it's because I'm black, isn't it * * * yeah, it's because I'm black, huh?" After that exchange, Baker begins to maneuver her car slowly, in reverse, away from the victims and slowly enunciates "worthless [inaudible] nigger." To this, the victims unleash a torrent of their own profanity-laced insults, telling Baker to "step out of the car" so they can "beat [her] ass," and calling her a "honkey" and a "stupid-cracker bitch" and a "racist." The final images from D.V.'s cell phone are mostly of the pavement, but the sound of squealing tires can be heard, along with D.V. yelling "watch out; watch out; watch out."

{¶ 6} During A.H.'s interview, he told police that, after he and his brother walked by Baker's car on their way to the store, she honked at them. In response, A.H. and D.V. "looked back" in the direction of the car, and Baker said, "Y'all about to die, niggers." A.H. admits that he began walking back toward the car, and demanded to know "what are we doing [wrong]?" and to know what her "problem" was. A.H. told police that he "didn't even know" Baker, and he admitted that he was "mad." According to A.H., Baker then began "chasing" him in her car and "driving around [in circles], trying to hit [him] with the car." D.V. was interviewed next. He told police that he and his brother sought refuge in the grocery cart corral area to prevent Baker from hitting them.

3.

Although Baker did not hit either victim, "she kept following" them and was still "trying to hit" them.

{¶ 7} Next, the police interviewed eyewitness and store employee, C.R., who was "on break" and watched the altercation from inside his car that was parked nearby. The eyewitness could see, but not hear what was said between the parties, because his car windows were up. According to him, the victims were "teasing" Baker, when she "gunned" her car at them. He told police that, "[Baker] was trying to hit them for sure." And, when the victims "got closer to her," then she "really tr[ied] to hit them." The eyewitness told police that Baker "could have left the parking lot" but instead she "tried [to hit them] multiple times."

{¶ 8} During a second conversation between the police and Baker, Baker repeated that she gave the victims the middle finger because she "was sick and tired of their shit, of [N-words] taunting me everywhere I fucking go, even walking past me when I'm sitting here parking." Baker told police that, after making that gesture, the victims began yelling "c'mon, c'mon" and "taking off their shirts" and "walking at me * * * *so I start charging my car at them.*" (Emphasis added.) When A.H., i.e. the "one in the black shirt," got a grocery cart and started "walking" toward Baker again, with the cart, she "charged at them again * * * but * * * swerved" out of the way and did not hit them. After this description of the incident, police arrested Baker on two counts of aggravated menacing.

4.

{¶ 9} After her arrest, the police talked to Baker one last time, specifically to ask why she had "approached" the victims. Baker explained that she was "fucking fed up of getting taunted by these stupid [N-words]." Baker added that she had "had enough" and was "sick of" being taunted "everywhere I go." Baker claimed that police had not "listen[ed]" to her previous complaints, and she decided to "fight back." The police pressed Baker on this point, asking if she had been harassed and taunted by the victims, in particular, or "all black people." Baker responded, "I don't remember if they [i.e. the victims] were here before. * * * I don't even know these fuckers."

{¶ 10} On August 31, 2020, Baker was indicted on two counts of ethnic intimidation, in violation of R.C. 2927.12(A) and (B), a felony of the fifth degree, one count for each victim (Counts 1 and 2) and two counts of aggravated menacing, in violation of R.C. 2903.21(A) and (B), a misdemeanor of the first degree, again one count for each victim (Counts 3 and 4).

{¶ 11} On September 27, 2021, Baker filed a motion to dismiss, arguing that the state had engaged in selective prosecution on the basis of race when it charged her for "using racial slurs" and "threatening the alleged victims" but failed to charge the victims, who had engaged in the same conduct. The state opposed the motion, and a hearing was held on October 26, 2021. At the hearing, the parties stipulated to a composite exhibit, identified Joint Ex. 1, consisting of the four videos previously described. Based upon its review of the videos and the arguments at hearing, the trial court denied Baker's motion.

5.

{¶ 12} A three-day jury trial was held, beginning on November 8, 2021. At trial, the state called both victims, the eye-witness, and the arresting officers. The defense moved for an acquittal and renewed its motion to dismiss, both of which were denied. The trial court also denied a defense request for a self-defense jury instruction. Following deliberations, the jury returned a guilty verdict as to all four counts, and the court ordered a presentence investigation in preparation for sentencing.

{¶ 13} At sentencing, the trial court found that the aggravated menacing counts, set forth in Counts 3 and 4, merged with the ethnic intimidation counts, set forth in Counts 1 and 2, and the state elected to proceed with sentencing as to the ethic intimidation counts. The trial court then sentenced Baker to serve six months in jail and to serve five years of community control. The imposition of community control included conditions that, among others, required Baker to have no direct or indirect contact with the victims and to submit to mental health treatment. The trial court also imposed two years of discretionary post-release control. Baker appealed and assigns two errors for review:

> I. The trial court erred in overruling defendant's motion to dismiss, in violation of defendant's right to due process and equal protection, as guaranteed by the Fifth and Fifth [sic] Amendments to the United States Constitution and Article I, Section 2, of the Constitution of the State of Ohio.

II. The trial court erred in denying defendant's request for an instruction of self-defense pursuant to Ohio Revised Code § 2901.05, in violation of defendant's rights to equal protection and due process, as guaranteed under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10, of the Constitution of the State of Ohio.

### III. Baker presented no evidence to support her claim of selective prosecution.

**{¶ 14}** In her first assignment of error, Baker alleges that the trial court erred when it denied her motion to dismiss. Baker complains that, while both she and the victims violated the ethnic intimidation statute, only she was charged. She claims that the state's charging decision was based upon her race.[1]

**{¶ 15}** "[A] trial court's determination regarding a motion to dismiss on selective-prosecution grounds presents a mixed question of law and fact." *State v. Michel*, 181 Ohio App.3d 124, 2009-Ohio-450, 908 N.E.2d 456, ¶ 9 (9th Dist.); *see also, Cleveland v. Oko,* 8th Dist. Cuyahoga No. 103278, 2016-Ohio-7774, ¶ 15. Appellate review of the trial court's determination "is analogous to our review of a motion to suppress." *Id.*

When considering a motion to [dismiss on the grounds of selective prosecution], the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility

---

[1] Baker does not allege that the state engaged in selective prosecution as to the aggravated menacing counts.

of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Internal citations omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. *Accord Michel* at ¶ 9.

{¶ 16} "A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *State v. Getsy*, 84 Ohio St.3d 180, 203, 702 N.E.2d 866 (1998). Selective prosecution claims sound in equal protection and protect against prosecutions "based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 43, quoting *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962).

{¶ 17} In *State v. Flynt*, 63 Ohio St.2d 132, 134, 407 N.E.2d 15 (1980), the Ohio Supreme Court adopted the following test with regard to selective-prosecution claims:

To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded

8.

against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

"A mere showing that another person similarly situated was not prosecuted is not enough; a defendant must demonstrate actual discrimination due to invidious motives or bad faith. Intentional or purposeful discrimination will not be presumed from a showing of differing treatment." *State v. Freeman*, 20 Ohio St.3d 55, 58, 485 N.E.2d 1043 (1985). *See also Flynt* at 134 ("The conscious exercise of some selectivity in enforcement is not in itself * * * a violation of the United States Constitution.").

{¶ 18} In this case, the court found that Baker failed to satisfy either prima facie element required under *Flynt*. As to the court's conclusion that Baker failed to show that the parties were similarly situated, the court made the following findings:

· Baker instigated the altercation by being the "first" to use a "derogatory comment" and to threaten "to do bodily harm," specifically by threatening "to kill [the victims]."

· The victims used derogatory language [i.e. cracker and honkie] "only * * * after" Baker told them that "they were going to die," and using the "N" word.

9.

· The victims "turned on their phone to start videotaping" because they "felt" that they had been the subject of a crime.

· Baker posed a threat to the victims because "she was inside her car."

· The victims did not pose a threat to Baker, because they were "on foot" and never got "close enough" to harm her.

· Baker's actions were motivated by race. In the court's own words, "you can't change what you said, Ms. Baker, [from] that video, [which is] that you did this because they were African American."

· Race was not a motivating factor for the victims. The court found that their words and conduct were "clearly in reaction" to Baker, who instigated the conflict.

{¶ 19} The court concluded that Baker failed to show any discriminatory animus by the state in its decision to prosecute Baker. It commented that that the police officers "[did]their job" in that "they made a fairly immediate charging decision after interviewing everybody at the scene."

{¶ 20} Baker raises the same arguments on appeal as she did before the trial court. That is, she claims that the parties were, in fact, similarly situated because both used racial slurs—Baker by calling the victims the "N" word and the victims by calling her a "honkie" and a "cracker"—and both made threats of violence—Baker by driving her car at them and the victims by threatening to "beat [Baker's] ass."

10.

{¶ 21} It was Baker's burden to show that the state treated her differently than other persons "who [were] in all relevant aspects alike to [her]." *State v. Williamson,* 9th Dist. Summit No. 29935, 2022-Ohio-185, ¶ 41 quoting *Harsco Corp. v. Tracy,* 86 Ohio St.3d 189, 192, 712 N.E.2d 1249 (1999) (Defendant failed to establish that he was similarly situated with four Caucasian deputies who were subjected to administrative, rather than criminal investigations). For purposes of a selective enforcement claim, a "similarly situated" individual is someone of another race or ethnicity who could have been arrested for the same offense as the defendant but was not. *Armstrong*, 517 U.S. at 469, 116 S.Ct. 1480, 134 L.E.2d 687 (Noting that "[t]he vast majority of the [Circuit] Courts of Appeals require the defendant to produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not, and this requirement is consistent with our equal protection case law.").

{¶ 22} Ethnic intimidation, as defined by R.C. 2927.12, can be committed by violating, with the requisite racial or ethnic animus, R.C. 2903.21 (aggravated menacing), 2903.22 (menacing), 2909.06 (criminal damaging or endangering), 2909.07 (criminal mischief), or 2917.21(A)(3), (4), or (5) (telecommunications harassment). *State v. Mutter*, 150 Ohio St. 3d 429, 2017-Ohio-2928, 82 N.E.3d 1141, ¶ 20. Here, the state indicted Baker alleging one predicate offense—aggravated menacing in violation of R.C. 2903.21—in the ethnic-intimidation charge. Therefore, the offense of ethnic intimidation, contains two elements: first, that Baker committed the predicate offense of aggravated menacing, in violation of R.C. 2903.21 and second, that she committed that

11.

offense because of the race, color, religion, or national origin of another person or group of persons. *Accord Mutter.* Again, the trial court found that Baker admitted to, and did, commit the predicate offense "because they were African American," whereas it found no evidence of racial animus by the victims,

{¶ 23} We agree. There is simply no evidence in this case that the victims "selected" Baker because she is Caucasian, nor is there any evidence that their actions were motivated by Baker's race. Rather, the evidence fully supports the trial court's conclusion that the victims' actions were taken *in response* to a confrontation instigated by Baker, who called them the "N word" and told them that they were going to "die." "It would not be unreasonable for anyone to react in anger to such confrontational conduct." *State v. Chopak,* 8th Dist. Cuyahoga No. 96947, 2012-Ohio-1537, ¶ 24. And, although the victims' use of the terms "honkey," and "stupid-cracker bitch" was offensive, "repugnant or obnoxious language does not, in itself, demonstrate than an action was undertaken "'by reason of the [another's] race.'" *Chopak* quotiing *State v. Kingery,* 2d Dist. Montgomery No. 24063, 2012–Ohio–505, ¶ 20. This is especially true in this case, where it was Baker who, unprovoked, instigated the altercation by accosting the victims with hateful and threatening language. Therefore, we agree with the trial court that the victims could not have been prosecuted for ethnic intimidation in this case because there is no evidence that they committed the predicate offense of aggravated menacing "by reason of the race, color, religion, or national origin of another person" as is required to

12.

prosecute a case under R.C. 2927.12. For these reasons, we find that Baker failed to satisfy the first prong of the *Flynt* test.

{¶ 24} The second element of the *Flynt* test required Baker to produce evidence that the state's decision to charge her was based upon "impermissible considerations as race, religion, or the desire to prevent [her] from exercising a constitutional right." *Flynt*. The mere fact that Baker was prosecuted and the victims were not is insufficient, as a matter of law, to establish a defense of selective prosecution. *State v. Freemam,* 20 Ohio St.3d 55, 485 N.E.2d 1043 (1985). Despite her claim, Baker has failed to produce any evidence that the state's prosecution of her was "because she is Caucasian." Moreover, it bears repeating that, initially, the charges against Baker were limited to two counts of aggravated menacing. It was not until she admitted to police that she drove at the victims as a way to "fight back,"—not at the victims, in particular, because she did not "even know" them—but against *all* black people, that the state, with good reason, added the ethnic intimidation charges.

{¶ 25} We find that the trial court's findings are supported by competent, credible evidence, and accepting these facts as true, Baker has failed to satisfy either prong of the *Flynt* test to establish a prima facie claim of selective prosecution. Accordingly, the trial court did not commit error in denying Baker's motion to dismiss on selective prosecution grounds, and her first assignment of error is overruled.

**IV. Baker was not entitled to self-defense jury instruction**.

13.

{¶ 26} In her second assignment of error, Baker alleges that the trial court erred in denying her request for a self-defense jury instruction.

{¶ 27} "The elements of self-defense differ depending upon whether the defendant, in defending [herself], used deadly or non-deadly force." *In re N.K.,* 6th Dist. Sandusky No. S-21-001, 2021-Ohio-3858, ¶ 12. "Deadly force" is defined as "any force that carries a substantial risk that it will proximately result in the death of any person." R.C. 2901.01(A)(2). A "substantial risk" is "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). In this case, Baker concedes that the act of driving her automobile "at" the victims constituted deadly force. *See, e.g., State v. Sepeda,* 6th Dist. Lucas No. L-21-1123, 2022-Ohio-1889, ¶ 40 (A vehicle can be a deadly weapon "when used in a manner likely to produce death or bodily harm.").

> The elements of a valid claim of self-defense [involving the use of deadly force] are as follows: (1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of such force; and (3) the defendant did not violate any duty to retreat or avoid the danger.

14.

*Sepeda* at ¶ 47, citing *State v. Petway,* 2020-Ohio-3848, 156 N.E.3d 467, ¶ 41 (11th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). (Additional citations omitted.)

{¶ 28} Self-defense is an affirmative defense—not an element of a crime. *State v. Messenger,* Slip Opinion No. 2022-Ohio-4562. Recently, in *Messenger,* the Ohio Supreme Court "clarified the burden of proof where a defendant asserts a claim of self-defense under the version of the statute that became effective March 28, 2019." *State v. Greer,* 6th Dist. Lucas No. L-22-1082, 2023-Ohio-103, ¶ 34, citing *Messenger.* It recognized that "R.C. 2901.05(B)(1) triggers the state's duty to disprove self-defense so long as 'there is evidence presented that tends to support that the accused person used the force in self-defense'"—a burden that is not all that heavy. *Id.* at ¶ 20, 22 ("The reference in R.C. 2901.05(B)(1) to 'evidence presented that tends to support' self-defense indicates that the defendant's burden of production is not a heavy one and that it might even be satisfied through the state's own evidence."). As such, "a defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *Id.* at ¶ 25. "[I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden," and the state must then disprove self-defense. *Id.* at ¶ 25. In that case, "the sufficiency-of-the-evidence standard of review applies to [the defendant's] burden of production and a

15.

manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Id.* at ¶ 26.

{¶ 29} "[A] determination as to whether the trial court applied the correct legal standard in reviewing and weighing the evidence presents a question of law requiring de novo review." *Greer* at ¶ 33 quoting *Dublin v. Starr*, 10th Dist. Franklin No. 21AP-173, 2022-Ohio-2298, ¶ 50.

{¶ 30} Here, Baker argues that she satisfied her burden of production to warrant a jury instruction on the issue of whether she acted in self-defense when she drove her vehicle at the victims because the record contains evidence that the victims "threatened" Baker by "asking her to exit her vehicle so [that] they could fight her * * * and 'beat her ass.'" Baker maintains that such evidence "tends to support" her claim that her use of deadly force was "only * * * because she felt she was being threatened." Baker urges, at a minimum, that it was a "debatable issue," that should have been decided by the jury, not the court.

{¶ 31} While discussing defense counsel's request—that the trial court instruct the jury on the issue of whether Baker acted in self-defense—the trial court reviewed the evidence on that issue. First, it noted that, according to A.H.'s testimony, he told Baker to "get out of your car; I'm going to beat your ass," from a distance of about ten feet from Baker's car. Although Baker did not testify, the "video of her at the scene" established that, in response to A.H.'s statements, Baker "stayed in her car" and then "did go after [the victims]" in her car. In finding that Baker was not entitled to a self-defense

16.

instruction, the court concluded that there was no evidence to support Baker's claim that, when she "did what she did," she acted out of a bona fide belief that she was in imminent danger of death or great bodily harm. Instead, Baker's "mindset" was "not because she was fearful" but rather "because [the victims] were African American."

{¶ 32} Our review of the record convinces us that the trial court complied with its obligation not to weigh the credibility of the evidence when determining whether Baker had satisfied her burden of production. *See, e.g., State v. Estelle,* 2021-Ohio-2636, 176 N.E.3d 380, ¶ 19 (3d Dist.) ("In deciding whether to give a self-defense instruction, the trial court must view the evidence in favor of the defendant, and the question of credibility is not to be considered."); *State v. Gambino*, 11th Dist. Trumbull No. 2021-T-0018, 2022-Ohio-1554, ¶ 24, *appeal not allowed*, 167 Ohio St.3d 1499, 2022-Ohio-2953, 193 N.E.3d 585 ("In determining whether the self-defense instruction is appropriate the 'court must view the evidence in a light most favorable to the defendant' without consideration of credibility."). Indeed, the trial court specified that its legal conclusion— that Baker failed to satisfy the second "element of self-defense"—was *not* predicated on the "credibility" of the evidence. That is, the court could not find "even a little bit of evidence" tending to show that Baker believed herself to be in imminent danger of death or great bodily harm. Other record evidence supports that conclusion, including testimony from the eyewitness who told police that Baker "could have left the parking lot" but instead "tried [to hit them] multiple times."

17.

{¶ 33} Because we find that Baker failed to produce any evidence tending to show that her use of deadly force was predicated upon a bona fide belief that she was in imminent danger of death or great bodily harm or that her only means of escape from such danger was in the use of such force, the trial court did not err in refusing to provide a self-defense instruction to the jury. Accordingly, we find Baker's second assignment of error not well-taken.

## V. Conclusion

{¶ 34} It was Baker's "heavy burden" to establish a claim of selective prosecution, and the record supports the conclusion that she produced no evidence of others being similarly situated to her and not prosecuted or that the state was motivated by discriminatory animus toward Baker on the basis of her race. Accordingly, we must conclude that the trial court did not err when it denied Baker's motion to dismiss, and her first assignment of error is found not well-taken.

{¶ 35} Likewise, Baker failed to present any evidence that, at the time she used deadly force, she had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape from such danger was in the use of such force. Therefore, the trial court did not err in refusing her request to instruct the jury on the issue of self-defense, and Baker's second assignment of error is also not well-taken.

{¶ 36} Having found Baker's assignments of error not well-taken, the December 8, 2021 judgment by the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, Baker is ordered to pay the costs of this appeal.

18.

Judgment affirmed.

State of Ohio v.
Angela Baker
C.A. No. L-21-1258

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.         _____
                                              JUDGE

Thomas J. Osowik, J.         

Gene A. Zmuda, J.             _____
CONCUR.                                    JUDGE

                                         _____
                                              JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.