[Cite as *State v. Hall*, 2023-Ohio-837.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 21AP-137 |
| | | (C.P.C. No. 19CR-1650) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Marton D. Hall, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 16, 2023

**On brief:** *G. Gary Tyack, Prosecuting Attorney*, and *Taylor M. Mick*, for appellee. **Argued:** *Taylor M. Mick.*

**On brief:** *Percy Squire Company LLC*, and *Percy Squire*, for appellant. **Argued:** *Percy Squire.*

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Marton D. Hall, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of aggravated murder, with a firearm specification. For the following reasons, we reverse and remand.

## I. Facts and Procedural History

{¶ 2} By indictment filed April 4, 2019, plaintiff-appellee, State of Ohio, charged Hall with one count of aggravated murder in violation of R.C. 2903.01, an unclassified felony, and two counts of murder in violation of R.C. 2903.02, both unclassified felonies. All three charges contained accompanying three-year firearm specifications pursuant to R.C. 2941.145(A). The charges arose from the shooting death of Tavon Peterson on March 24, 2019. Hall pleaded not guilty, and he moved to suppress statements he made to

Columbus Division of Police ("CPD") detectives during questioning in the days after the shooting.  On March 2, 2020, the trial court held a suppression hearing.  The trial court orally denied Hall's suppression motion, and the matter immediately proceeded to a jury trial.

{¶ 3}   As pertinent to this appeal, the following evidence was adduced at trial.  CPD Officer Kelly Melvin testified that, during the late hours of March 24, 2019, he and other officers were dispatched to an apartment on Balsam Lake Drive in Columbus, on report of a shooting.  On arriving, they discovered Peterson's body on the floor of the apartment surrounded by spent bullet casings. Peterson had sustained multiple gunshot wounds and was deceased.  Hall and his brother Marcus were placed into custody at the scene.

{¶ 4}   Robert Powers, the lead CPD detective investigating Peterson's death, testified at both the suppression hearing and at trial.  His suppression hearing testimony is detailed below in our discussion of Hall's first assignment of error.  At trial, Detective Powers testified regarding his interrogations of Hall soon after the shooting, and recordings of those interrogations were admitted into evidence and played for the jury as substantive evidence as part of the state's case-in-chief.  Detective Powers interviewed Hall on three separate occasions.  First, he interviewed Hall at the CPD headquarters on the night of the shooting.  Second, he interviewed Hall at the home of Hall's parents on March 27, 2019.  And third, he interviewed Hall at CPD headquarters in the early hours of March 28, 2019.  The first and third interviews were video and audio recorded, and the second interview was only audio recorded.

{¶ 5}   Hall made the following statements at the first interview.  Peterson had been staying at Hall's apartment for two days because Peterson had an argument with his live-in girlfriend.  Hall and Peterson got into a fight, and Hall won this initial fight.  Prior to the fight, Hall removed his socks because the kitchen floor was slick.  Peterson wanted to fight again because he thought Hall had taken a cheap shot at him.  They engaged in a short tussle, and then Peterson said he could have killed Hall with a glass vodka bottle.  Peterson then immediately got that bottle and struck Hall in the head with it, causing Hall to bleed.  Hall continued to punch Peterson, and then, because Hall saw Peterson going into the kitchen where his gun was located, Hall went to retrieve his gun in another room.  Hall believed Peterson was going to kill him.

{¶ 6}  When Hall returned with a gun, Peterson was holding his silver .40-caliber gun.  Hall fired, as fast as possible, all the bullets in his gun at Peterson.  Hall denied shooting Peterson while Peterson was on the ground, but later in the interview stated that he was not sure about that fact.  Initially, Hall denied touching Peterson's gun, but then stated he picked up that gun to get it away from Peterson.  Hall stated he told his brother, who was in the apartment during the fights, to call 911, and then Hall stepped outside the apartment to get fresh air.  He closed Peterson's eyelids before leaving the apartment.  Later that night, Hall acknowledged that he took Peterson's gun into a bedroom, but he also indicated that he did not think that he fired that gun.  Hall was released from custody once the interview concluded.

{¶ 7}  During the audio recorded interview at his parents' home on March 27, 2019, Hall made the following statements.  When detective Powers confronted Hall with the fact that a .40-caliber bullet had been recovered from Peterson's body, Hall said that maybe Peterson's gun fired when Hall picked it up.  Detective Powers further explained that the investigation and autopsy showed that Peterson may have been shot in the chest while laying on the floor, and then the detective asked Hall whether he stood over Peterson and shot him.  Hall responded, "[m]aybe in the heat of the moment I was maybe trying to put him out of his misery 'cause he was trying to kill me." (State's Ex. V2 at 07:56.)  Hall added, "that might have been overkill with that." *Id*. at 08:48.  Hall was placed into custody and again taken to CPD headquarters.

{¶ 8}  The third interview took place on March 28, 2019 at CPD headquarters. Hall made the following statements.  Before the physical altercations, Hall and Peterson were watching a movie.  The two began to argue, and then they fought.  Prior to the fight, Hall took his gun to a back room.  Hall won the fight, and Peterson said he wanted Hall's face to look like his. They fought a second time, and Hall again won that fight.  Peterson twice said he was going to kill Hall, mentioning his bottle and pistol, and then he struck Hall with a bottle. They fought for a third time.  At that point, Peterson went into the kitchen to get his gun, and Hall went to the bedroom to retrieve his gun that he had just placed there.  When Hall returned, Peterson had his gun in his right hand.  After Hall shot Peterson, he fell to the ground, and Hall picked up Peterson's gun.  Hall then had both guns in his hands. Peterson looked "crazy," and "like he was in misery." (State's Ex. V3 at 15:57.)  Hall then

shot Peterson again "to put him out of his misery." *Id.* at 16:05. Hall closed Peterson's eyelids. The detective asked how that was self-defense, and Hall responded, "[i]t was mercy. It was mercy. Swear to God." *Id.* at 16:35. Hall stated his belief that the "extra bullet" that he "put in him when he was down got him out of his misery." *Id.* at 27:49. When Hall was asked if he had anything to add about what happened, he stated, "I know I did a mercy shot." *Id.* at 31:42.

{¶ 9}  At the trial, Hall testified in his own defense. He admitted to shooting and killing Peterson.   But he explained, "[Peterson] had threatened to kill my – threatened to kill me. He struck me in the head with a large Vodka bottle. He drew his weapon, and I was in fear for my life." (Mar. 6, 2020 Tr. Vol. IV at 867.) Hall detailed the circumstances that led to the shooting.

{¶ 10} When Peterson arrived at Hall's apartment on March 23, 2019, he had his backpack, which contained alcohol, marijuana, and his pistol. Peterson placed his pistol in a kitchen drawer. The next day, Hall and Peterson ran errands around town, and eventually returned to Hall's apartment to hang out. The conversations between the two began to escalate, and Hall decided to put his own gun in his bedroom. Things escalated more, and Peterson took a swing at Hall. Hall "ended up getting the best of him." *Id.* at 892. Peterson walked to the bathroom area, looked at himself in a mirror, and he told Hall he would not stop until Hall's face looked like his. They continued to argue, Peterson grabbed Hall, and they briefly wrestled. Hall repeatedly told Peterson to leave.   Peterson said, "I'm going to kill you. I got bottles. I got a .40." *Id.* at 897. Peterson then picked up the vodka bottle and struck Hall on the head with it. Hall grabbed Peterson, but Peterson got away and "head[ed] back towards the kitchen." *Id.* at 898. Because Peterson "was going for his weapon," Hall "went to retrieve [his] weapon from [his] room." *Id.* Hall's brother, Marcus, was in the living room during these altercations.

{¶ 11} Upon returning from his bedroom with his gun, Hall saw Peterson with his gun in his right hand, and as Peterson began to raise the gun toward Hall, Hall started to shoot. Hall feared for his life and fired "until the clip emptied." *Id.* at 901. Peterson fell to the ground, with his gun still in his hand. Hall, unaware of whether Peterson was still alive, set down his gun and disarmed Peterson. At that point, things were "kind of cloudy" for Hall, and he was "not sure" whether he fired Peterson's gun. *Id.* at 904. Hall explained

that, when the detective informed him that Peterson was struck with a bullet from the .40-caliber pistol, he made the "assumption" that he had fired it, despite first denying that fact to the detective. *Id.* at 905. He further testified, "[m]aybe when I picked it up, it must have went off." *Id.* And when confronted at trial with his prior statements that the single shot with Peterson's gun was to "put him out of his misery," or was a "mercy shot," Hall acknowledged making those statements, but again explained they were based on his assumption of what happened. *Id.* at 958. Hall also denied initiating any of his fights with Peterson prior to the shooting. After the shooting, Hall received medical treatment at Riverside Methodist Hospital, which included getting three staples to close the wound on his head.

{¶ 12} Hall's brother, Marcus Hall, who was in the apartment at the time of the shooting, testified that Peterson was there when Marcus arrived at approximately 9:00 p.m., March 24, 2019. Hall and Peterson began to argue in the living room area, and Peterson asked Hall, "[do] you want to fight?" and Hall responded affirmatively. (Mar. 4, 2020 Tr. Vol. II at 403.) Peterson threw the first punch, and Marcus broke up the fight. They momentarily stopped fighting, and then they resumed. Marcus again broke up the fight. Then Peterson stated, "I could have killed you with the bottle and gun that I have." *Id.* at 410. Hall and Peterson resumed fighting, and then Peterson retrieved the bottle and "slam[med] it over Marton's head." *Id.* at 413. Hall held Peterson for a "brief second before" Peterson went to the kitchen and returned with his gun in his hand. *Id.* Marcus acknowledged that, contrary to his trial testimony, during an interview with police on the night of the shooting, he stated that he was not sure whether Peterson had a gun. Hall also retrieved a gun and returned. Shots were fired while Marcus was still in the apartment's living room. Without seeing who was firing the shots, Marcus went to a bedroom, and he returned when the shooting stopped.

{¶ 13} CPD Detective Suzanne Nissley testified that a 9 mm semi-automatic pistol on a kitchen counter, and a .40-caliber semi-automatic pistol on a bed in one of the apartment's two bedrooms, were recovered at the shooting scene. The magazine in the 9 mm pistol was empty, but the magazine for the .40-caliber pistol contained eight unfired rounds. The detectives also found and collected two different caliber bullet casings, 9 mm and .40-caliber, and a vodka bottle.

{¶ 14} Peterson's live-in girlfriend, Yuphin Saidee, testified that Peterson owned a firearm, which she believed was .40-caliber. She further testified that they had an argument on March 23, 2019, and Peterson left their apartment to stay elsewhere, taking that firearm with him.

{¶ 15} Detective Powers testified they submitted to the CPD crime lab the two firearms recovered from the scene, and the bullets recovered from Peterson's body, for operability and comparison testing.

{¶ 16} Brian Johnson, a CPD crime lab forensic scientist, testified that he examined and tested those 2 firearms, and he compared identifying characteristics of those firearms with the bullets submitted to him for analysis. Johnson determined the 12 submitted .38-caliber bullets were fired from the same firearm, but, even though the recovered 9-mm pistol fires .38-caliber bullets, he was unable to conclusively match the submitted bullets with that particular weapon. Additionally, he opined that the one submitted .40-caliber bullet was fired by the .40-caliber pistol found at the scene.

{¶ 17} The testifying coroner, Andrew Sexton, D.O., opined that Peterson's cause of death was multiple gunshot wounds. However, the coroner was unable to identify the sequence of the wounds. According to the coroner's report, Peterson sustained 15 gunshot wounds to his body, including wounds to his head, neck, chest, torso, and extremities.[1] The wound associated with a bullet retrieved from Peterson's torso demonstrated that, when Peterson was struck with that bullet, he was either positioned against a firm surface or was wearing tight clothing, which prevented that bullet from exiting his body. Unlike the other retrieved bullets, which were described in the report as "medium caliber," this particular bullet was described as "large caliber." (State's Ex. L.)

{¶ 18} Hall requested a self-defense jury instruction, which the trial court denied. Following deliberations, the jury found Hall guilty on all counts and specifications. For the purpose of sentencing, Counts 2 and 3 (both murder charges) merged with Count 1 (the aggravated murder charge). The trial court imposed a sentence of life imprisonment

---

[1] The disparity between the number of bullets recovered (13) and the number of gunshot wounds identified in the coroner's report (15) was not reconciled by testimony or other evidence.

without the possibility of parole, plus a mandatory consecutive three-year prison sentence for the firearm specification.

{¶ 19} Hall timely appeals.

## II. Assignments of Error

{¶ 20} Hall assigns the following errors for our review:

> I. Appellant was denied his constitutional rights, including Fourth Amendment Rights, due process of law and a fair trial, and the trial court committed reversible and prejudicial error, when the court refused to suppress appellant's pretrial statements made to detectives of the Columbus Division of Police.

> II. Appellant was denied due process of law and a fair trial, and the trial court committed reversible and prejudicial error, when the trial court failed to properly instruct the jury on the affirmative defense of self-defense and defense of another as applicable to a shooting that occurred in appellant's own home, against an individual who was larger than appellant, had a criminal history, and appellant, presented evidence showing the decedent, to be an aggressor, intruder or trespasser in the home.

> III. Appellant was denied due process of law and a fair trial, and the trial court committed reversible and prejudicial error, when the court refused to allow appellant's expert to testify concerning the mental state of the appellant and the reasonableness of his beliefs and of his use of force at the time he committed the alleged offenses and excluding this expert's report.

> IV. The admission at trial of state's evidence and argument to the jury that ordinary citizens have a different standard of care for self-defense than law enforcement officers constituted plain error and prosecutorial misconduct.

## III. Discussion

### A. First Assignment of Error – Hall's statements during interrogations

{¶ 21} Hall's first assignment of error alleges the trial court erred in denying his request to suppress statements he made to CPD detectives during interrogations in the days following the shooting. This assignment of error lacks merit.

**{¶ 22}** " 'Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " (Internal citations omitted.) *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

**{¶ 23}** Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself or herself. To safeguard this right, a suspect in police custody " 'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' " *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, ¶ 6, quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). The Fourteenth Amendment to the United States Constitution makes the privilege against self-incrimination applicable to a witness in a state proceeding. *Malloy v. Hogan*, 378 U.S. 1, 3 (1964). "A similar privilege is recognized in Article I, Section 10 of the Ohio Constitution." *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, ¶ 8.

**{¶ 24}** "What are now commonly known as *Miranda* warnings are intended to protect a suspect from the coercive pressure present during a custodial interrogation." *Oles* at ¶ 9, citing *Miranda* at 469. "A custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Oles* at ¶ 9, quoting *Miranda* at 444. The primary inquiry is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983), quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). In determining whether a person's freedom of movement was so restrained, what is examined is not the subjective views of the person or of the authorities but the "objective circumstances" of the questioning. *Stansbury v. California*, 511 U.S. 318, 323 (1994). This means whether a

person "was subject to a custodial interrogation depends upon whether a reasonable person in the offender's position would have understood herself or himself to be in custody." *State v. Montgomery*, 1st Dist. No. C-220063, 2022-Ohio-4030, ¶ 20, citing *Oles* at ¶ 30. Thus, "[d]etermining what constitutes custody for *Miranda* purposes depends on the facts of each case." *State v. Neely*, 161 Ohio App.3d 99, 2005-Ohio-2342, ¶ 26 (1st Dist.).

{¶ 25} "If a suspect provides responses while in custody without having first been informed of his or her *Miranda* rights, the responses may not be admitted at trial as evidence of guilt." *Oles* at ¶ 9, citing *Miranda* at 479. Further, "[i]f a suspect requests counsel, all interrogation must cease until an attorney is present or the suspect himself initiates communication." *State v. Curtis*, 10th Dist. No. 05AP-795, 2006-Ohio-4230, ¶ 13, citing *Edwards v. Arizona*, 451 U.S. 477, 481 (1981). However, after *Miranda* "warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Miranda* at 479.

{¶ 26} Whether there is a valid waiver of *Miranda* rights involves a dual inquiry. " 'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Lather* at ¶ 7, quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "The burden is on the prosecution to prove [ ] appellant made a knowing, intelligent, and voluntary waiver of constitutional rights." *State v. Drew*, 10th Dist. No. 07AP-467, 2008-Ohio-2797, ¶ 72. Whether a suspect voluntarily waives his *Miranda* rights is based on the totality of the circumstances. *State v. Clark*, 38 Ohio St.3d 252, 261 (1988). The totality of the circumstances includes "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, ¶ 25, citing *State v. Eley*, 77 Ohio St.3d 174, 178 (1996). "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Lather* at ¶ 7, citing *Moran* at 421, quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

{¶ 27} CPD detectives questioned Hall on three separate occasions—at CPD headquarters on the night of the shooting, at his parents' home on March 27, 2019, and at CPD headquarters during the early hours of March 28, 2019.  Hall contends that he was in police custody during all three questioning sessions, and that he never validly waived his *Miranda* rights.  The state agrees Hall was in custody both times he was interrogated at CPD headquarters but disagrees with Hall's assertion that he was in custody when questioned at his parents' home.  Thus, before considering any *Miranda* waiver issue, we must address whether the police questioning of Hall at his parents' home constituted a custodial interrogation.

{¶ 28} At the suppression hearing, detective Powers testified as to the circumstances of the questioning at the home of Hall's parents.  When detective Powers and another detective arrived, they introduced themselves, and Hall's father let them in the house.  The detectives permitted the 24-year-old Hall to have his parents present during the interview, and they advised Hall that he was not required to answer their questions.  The detectives informed Hall that he could voluntarily speak with them in the house or in their unmarked city vehicle.  Hall chose to remain in the home and talk with the detectives at the home's dining room table.  Hall was not placed in handcuffs or otherwise detained as he spoke with the detectives.  But once Hall stated he may have shot Peterson with the second gun as a form of mercy, Hall's father intervened and requested the conversation stop.  At that time, the detectives placed Hall under arrest and transported him to CPD headquarters.

{¶ 29} Detective Powers' testimony demonstrated that Hall's questioning on March 27, 2019, was not in a restrictive or coercive environment as he was informed that he was not required to answer their questions, he was presented with options as to where they could discuss the matter, he chose to speak with the detectives at his parents' dining room table, and he had no limit on his freedom of movement.  Considering these circumstances, a reasonable person would not have understood himself to be in custody.  Consequently, Hall was not subject to a custodial interrogation on March 27, 2019, and *Miranda* warnings were not required for the interview on that date.

{¶ 30} Unlike the March 27, 2019 interview, Hall was in police custody when he was questioned at CPD headquarters on the night of the shooting and during the early morning hours of March 28, 2019.  On both of those occasions, Hall was advised of his *Miranda*

rights, he indicated his waiver of those rights with his signature, and he spoke with the detectives about the circumstances of the shooting. Hall contends, however, that those *Miranda* waivers were invalid. While acknowledging he was properly given *Miranda* warnings in connection with the interrogations, and he indicated his waiver of *Miranda* rights, he asserts he was incapable of voluntarily waiving his *Miranda* rights based on his compromised physical and mental condition after the shooting. In support, Hall cites the trauma of the event, his head injury, his taking of prescribed ibuprofen for pain, and his alcohol and marijuana use. We are unpersuaded.

{¶ 31} The evidence demonstrated Hall's knowing, intelligent, and voluntary waiver of his *Miranda* rights at both custodial interrogations. Prior to both of those interrogations, Detective Powers read a constitutional rights waiver form to Hall, and Hall signed those forms. " 'An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver.' " *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, ¶ 106, quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). Further, there was no indication that Hall was incapable of validly waiving his *Miranda* rights. Detective Powers testified that when he first encountered Hall on the night of the shooting, Hall had a bandaged injury on the top of his head with some dry blood on his face. When asked about alcohol or drug use, Hall indicated he had ingested one 12-ounce can of beer and smoked one gram of marijuana. Detective Powers also learned during the interview at the home of Hall's parents that Hall earlier had smoked a blunt, he had been treated at Riverside Methodist Hospital following the shooting, including receiving three staples on his head for the laceration, and he had been prescribed ibuprofen for his pain. Based on Detective Powers' observations, however, Hall never appeared drunk or high, and he always made coherent statements in response to questioning. Thus, even though Hall had sustained an injury to his head, ingested some alcohol and marijuana, experienced a traumatic event, other undisputed evidence demonstrated that these circumstances did not prevent Hall from knowingly, intelligently, and voluntarily waiving his *Miranda* rights.

{¶ 32} Because the trial court did not err in overruling Hall's motion to suppress, we overrule his first assignment of error.

**B. Second Assignment of Error – Self-defense and defense of another jury instructions**

{¶ 33} In his second assignment of error, Hall contends the trial court erred in not instructing the jury on self-defense and defense of another. Although Hall generally alleges the trial court erred in not giving a defense of another instruction, he does not support this contention with any legal analysis. And we decline to develop this issue on Hall's behalf. *See Bond v. Canal Winchester*, 10th Dist. No. 07AP-556, 2008-Ohio-945, ¶ 16 ("It is the duty of the appellant, not the appellate court, to construct the legal arguments necessary to support the appellant's assignments of error."). Thus, insofar as Hall's second assignment of error relates to the trial court not giving a defense of another jury instruction, it is overruled. However, Hall has persuasively supported his contention that the trial court erred in denying his request for a self-defense jury instruction.

{¶ 34} Generally, a trial court's jury instructions are reviewed for an abuse of discretion. *State v. Dovangpraseuth*, 10th Dist. No. 05AP-88, 2006-Ohio-1533, ¶ 30. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). However, whether a particular jury instruction is warranted by the evidence is a question of law. *State v. Daniels*, 10th Dist. No. 18AP-626, 2019-Ohio-1791, ¶ 4. *See Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, ¶ 22 ("The question of whether a jury instruction is legally correct and factually warranted is subject to de novo review.").

{¶ 35} "The court must give all instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder." *State v. Joy*, 74 Ohio St.3d 178, 181 (1995), citing *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. Conversely, " '[i]t is well established that the trial court will not instruct the jury where there is no evidence to support an issue.' " *State v. Mankin*, 10th Dist. No. 19AP-650, 2020-Ohio-5317, ¶ 34, quoting *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991), citing *Riley v. Cincinnati*, 46 Ohio St.2d 287 (1976). In reviewing a record to determine whether there is sufficient evidence to support the giving of an instruction, " 'an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction.' " *Murphy* at 591, quoting *Feterle v. Huettner*, 28 Ohio St.2d 54 (1971), syllabus. Thus, to be entitled to a jury

instruction on an affirmative defense, a defendant must introduce sufficient evidence that, if believed, would raise a question in the minds of reasonable jurors as to the existence of such an issue. *State v. Melchior*, 56 Ohio St.2d 15 (1978), paragraph one of the syllabus. The trial court must view the evidence in favor of the defendant and not consider the question of credibility. *State v. Baker*, 6th Dist. No. L-21-1258, 2023-Ohio-241, ¶ 32; *State v. Estelle*, 3d Dist. No. 1-20-50, 2021-Ohio-2636, ¶ 19; *State v. Jacinto*, 8th Dist. No. 108944, 2020-Ohio-3722, ¶ 42. But "[i]f the evidence generates only a mere speculation or possible doubt, such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted." (Internal quotations and citations omitted.) *State v. Wilcox*, 10th Dist. No. 15AP-957, 2016-Ohio-7865, ¶ 48. *See State v. Davidson-Dixon*, 8th Dist. No. 109557, 2021-Ohio-1485, ¶ 20 (defendant's "bare assertion," without "supporting evidence from whatever source," will be insufficient to warrant submission of affirmative defense to jury).

{¶ 36} Self-defense is an affirmative defense. *State v. Zafar*, 10th Dist. No. 19AP-255, 2020-Ohio-3341, ¶ 42. The elements of a self-defense claim are: (1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the defendant did not violate any duty to retreat or avoid the danger. *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

{¶ 37} Effective March 28, 2019, R.C. 2901.05(B)(1)[2] provides:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

---

[2] This version of R.C. 2901.05(B)(1) "applies prospectively to all trials occurring after its effective date, regardless of when the underlying alleged criminal conduct occurred." *State v. Brooks*, _ Ohio St.3d _ , 2022-Ohio-2478, ¶ 23.

{¶ 38} This version of R.C. 2901.05(B)(1) requires the state "to disprove self-defense by proving beyond a reasonable doubt that [the defendant] (1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger." (Emphasis sic.) *State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2691, ¶ 31; *see also State v. Daley*, 10th Dist. No. 19AP-561, 2020-Ohio-4390, ¶ 39. Although "the burden of *proof* for the affirmative defense of self-defense has shifted to the state, the burden of *production* for all affirmative defenses, including self-defense, remains with the defendant." (Emphasis sic.) *State v. Messenger*, 10th Dist. No. 19AP-879, 2021-Ohio-2044, ¶ 44, citing *State v. Parrish*, 1st Dist. No. C-190379, 2020-Ohio-4807, ¶ 14; *State v. Petway*, 11th Dist. No. 2019-L-124, 2020-Ohio-3848, ¶ 55.

{¶ 39} Based on these principles, for Hall to have been entitled to a jury instruction on self-defense, there must have been sufficient evidence presented that, if believed, would raise a question in the minds of reasonable jurors concerning the existence of self-defense. We find that Hall met this burden of production.

{¶ 40} As to the first prong of a self-defense claim, evidence was presented tending to show that Hall was not at fault in creating the situation that resulted in Peterson's death. The testimony of Hall and his brother Marcus, in addition to the recorded interrogations of Hall, demonstrated that Hall and Peterson engaged in arguments and physical altercations prior to the shooting. Hall testified that Peterson threw the first punch and eventually struck him on the head with a glass vodka bottle, causing a laceration. He denied initiating any of his fights with Peterson. The responding CPD officers testified that they observed the injury to Hall's head on arriving at the scene. Hall further testified that Peterson threatened to kill him, was the first to move toward retrieving a gun after one of the physical altercations, and started to raise his gun toward Hall before Hall fired his gun. If believed, Hall's testimony demonstrated that Peterson both initiated the physical altercations and escalated the confrontation by retrieving his gun, causing Hall to retrieve his own gun to protect himself. Thus, Hall presented evidence reasonably demonstrating that he was not at fault in escalating the otherwise hand-to-hand confrontation into a gunfight.

{¶ 41} The second prong of a self-defense claim presents the issue of whether the defendant had an honest belief that he was in imminent danger of death or great bodily harm and that the use of deadly force was the only means of escape. Under this prong, the defendant must have used only that force reasonably necessary to repel the attack. That is, he must not have used excessive force. *State v. Kean*, 10th Dist. No. 17AP-427, 2019-Ohio-1171, ¶ 58. Again, Hall's testimony indicated that Peterson threatened to kill Hall during a physical altercation, Peterson struck Hall on the head with a glass vodka bottle, and then he retrieved a gun and began to raise that gun at Hall. Hall testified that he responded by rapidly firing all the bullets in his semi-automatic pistol. The testimony of Hall's brother, Marcus, also indicated that, after their second fight, Peterson told Hall that he could have killed him with a bottle and his gun, then he struck Hall with the glass vodka bottle and retrieved a gun from the kitchen. During an interview with police on the night of the shooting, however, Marcus had stated that he was not sure whether Peterson had a gun. Although Marcus was in the apartment at the time of the shooting, he testified that he did not see the shots fired.

{¶ 42} There was also evidence that Peterson was shot once in the torso with his own firearm, a .40-caliber semi-automatic pistol. As to this shot, the state points to Hall's pretrial statements, that he fired Peterson's gun as a "mercy shot," to take Peterson "out of his misery," as proof that Hall did not act in self-defense. (State's Ex. V3 at 16:05.) Clearly, such action would not constitute self-defense. However, at trial, Hall testified that his prior statements regarding that shot were based on his "assumption" that he fired Peterson's gun. (Mar. 6, 2020 Tr. Vol. IV at 905.) He explained that he remembered disarming Peterson once Peterson fell to the ground with the gun still in hand, but that he was "not sure" whether he fired the weapon, and things were "kind of cloudy" for him. *Id.* at 904. Hall further testified that, "[m]aybe when I picked it up, it must have went off." *Id.* at 905. Although Hall's testimony was inconsistent with his prior "mercy shot" statements during interrogations, this testimony, if believed, reasonably demonstrated that the single shot from Peterson's firearm was an inadvertent consequence of Hall disarming Peterson. (State's Ex. V3 at 31:42.) The mere existence of conflicting evidence does not render certain evidence incredible as a matter of law. *See, e.g.*, *State v. Stewart*, 10th Dist. No. 12AP-527, 2013-Ohio-1463, ¶ 20. It is primarily the role of the trier of fact to resolve evidentiary

inconsistencies, including "believe[ing] all, part, or none of a witness's testimony," as it deems appropriate. *State v. Craig*, 10th Dist. No. 21AP-468, 2022-Ohio-1219, ¶ 18.

{¶ 43} Construed in Hall's favor, evidence presented at trial reasonably demonstrated that Hall had an honest belief that he faced imminent grave danger, and that he used only that force necessary to protect himself from that danger.

{¶ 44} As to the third prong of a self-defense claim, Hall needed to show he did not violate a duty to retreat. The evidence demonstrated that Hall was in his home when he shot and killed Peterson. "[P]ursuant to R.C. 2901.09(B), there is no duty to retreat before using defensive force when a person is attacked in his or her own home." *State v. Collins*, 10th Dist. No. 19AP-373, 2020-Ohio-3126, ¶ 39. Therefore, Hall had no duty to retreat before he used deadly force against Peterson.

{¶ 45} Because the record contains evidence that, if believed, tended to show all three necessary elements for a self-defense claim, the trial court erred in not giving the jury a self-defense instruction. This was prejudicial error. *See State v. Belanger*, 190 Ohio App.3d 377, 2010-Ohio-5407, ¶ 6-7 (3d Dist.) (finding prejudicial error in trial court's failure to give self-defense jury instruction); *State v. Sims*, 8th Dist. No. 85608, 2005-Ohio-5846, ¶ 17 (failure to instruct jury on deadly force self-defense was prejudicial). Accordingly, we sustain Hall's second assignment of error to the extent Hall alleges the trial court erred in not giving a self-defense jury instruction. As to a defense of another instruction, the assignment of error is overruled.

## C. Third and Fourth Assignments of Error – Self-defense expert evidence and use of force argument and evidence

{¶ 46} Hall's third assignment of error alleges the trial court erred in excluding the testimony and report of his self-defense expert witness. And in his fourth assignment of error, Hall argues the trial court plainly erred in permitting the state to argue and elicit testimony that improperly indicated that private citizens have a different self-defense use of force standard than law enforcement officers. Our resolution of Hall's second

assignment of error renders moot his third and fourth assignments of error, as this matter must be remanded for a new trial.[3]

## IV. Disposition

{¶ 47} We overrule Hall's first assignment of error, sustain in part, and overrule in part, his second assignment of error, and find as moot his third and fourth assignments of error. Having sustained in part Hall's second assignment of error, we reverse the judgment of the Franklin County Court of Common Pleas and remand this matter for further proceedings consistent with law and this decision.

*Judgment reversed;*
*cause remanded.*

DORRIAN and EDELSTEIN, JJ., concur.

_____

[3] As to Hall's third assignment of error, we note the trial court did not permit Hall to introduce into evidence the testimony and report of his self-defense expert witness based on its finding that Hall did not meet his burden of producing sufficient evidence tending to show he acted in self-defense. While we have concluded that the trial court erred as to this burden of production finding, we decline to analyze, in this appeal, whether that testimony and report was otherwise admissible. This allows the trial court, on remand, and if necessary, to fully resolve the issue in the first instance.